UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                      :
                                                            :
NANCY L. CARPENTER,                                         :
                          Debtor.                           :
-------------------------------------------------------------x       **OPINION AND ORDER**
ROBERT C. ROZELL,                                           :
                          Plaintiff/Appellant,              :       16 CV 4360 (VB)
                                                            :
v.                                                          :
                                                            :
NANCY L. CARPENTER,                                         :
                          Defendant/Appellee.               :
-------------------------------------------------------------x

Briccetti, J.:

      Plaintiff/Appellant Robert Rozell appeals from a May 26, 2016, order of the United

States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")

granting summary judgment in favor of Defendant/Appellee Nancy L. Carpenter dismissing

Rozell's claims that Carpenter's debt owed to Rozell was not dischargeable in bankruptcy under

11 U.S.C. § 523(a)(4) and (a)(6). (App. at 225–26).[1]

      For the following reasons, the Bankruptcy Court's order is AFFIRMED.

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 158(a).

---

[1]     "App." refers to appellant's appendix on appeal. (Doc. #11-1–20). Appellee also filed an appendix, but both exhibits contained therein are duplicative of exhibits contained in appellant's appendix. (Doc. #12-1–2). For ease of reference, the Court refers to only appellant's appendix.

**BACKGROUND**

I.     <u>Undisputed Facts</u>

Rozell and Carpenter were engaged to be married, and Rozell gave Carpenter a diamond engagement ring (the "Ring") in contemplation of their marriage.  Rozell purchased the Ring for $13,680.  After the parties' engagement ended, Carpenter sold the Ring for $2,000.

II.    <u>Carpenter's Deposition Testimony</u>

At her April 28, 2014, deposition in this case, Carpenter testified she and Rozell became engaged around August 2008 after dating for two years.  In 2010, Carpenter and Rozell agreed to cohabitate and bought a house together.  Carpenter's minor son from her prior marriage lived with them, and Rozell's children from his prior marriage lived with them half-time.

According to Carpenter, by 2011, Rozell and Carpenter's relationship had deteriorated, and she came to believe living with Rozell and her relationship with Rozell created a dangerous situation.  By June 2011, Carpenter became so afraid, she moved herself and her son out of the home they shared with Rozell.

Rozell's counsel asked, "Did Mr. Rozell create an unsafe situation for you in your house with the child?"  (App. at 122).  Carpenter responded, "Based on what the police said and based on what I believe, yes.  Based on what the domestic violence people said, yes."  (<u>Id</u>.).  She testified, "On several occasions he threatened to throw me and my son out of the house, to lock us out, [so] that we could not get our things, come in and get them, until the sheriff's department told him you cannot keep her things."  (<u>Id</u>. at 122–23).  She further testified that, toward the end of their relationship, Rozell made life "a living hell" for her and threatened her, and that she was so afraid that she would lock herself in her son's room.  (<u>Id</u>. at 123).  Carpenter also testified

Rozell "ma[de] gestures like he's going to punch me in the face and then laugh[ed] at me when I jump[ed] back . . . scared."  (Id.).

During Carpenter's deposition, Rozell's counsel asked multiple times whether she believed she was required to return the Ring to Rozell.  At one point, she testified she was not sure about her legal obligations, and that "I didn't think about it. . . .  I didn't think about it at the time, probably not."  (App. at 118–19).  She testified that, at the time of the dissolution of the relationship:

> I was not sure [whether I needed to return the Ring], honestly, under the law, I didn't think about it.  What I thought about was that I needed to get to a safe place and that was the way to do it and I did not think about anything else.  That was all I thought of and that was the access to do it[.] . . .  I needed money to move. . . .  I needed the money to get out. . . .  I never thought.  I never really – – – earlier than the time when I was going to do it, sell the ring, I never thought about it and when I was going to sell the ring I didn't care, it didn't make a difference to me who – – – all I cared about was getting that money and getting out of that house. . . .  That's all I cared about.

(Id. at 119–20).

Carpenter further testified that she did not believe she owed Rozell anything because of the way he treated her, and also because:

> I gave him half of a house and all of the appliances [when I moved out], brand-new stainless steel appliances in the kitchen, which increases the value of the house, he got all of that.  I didn't ask for anything.  I said take it all, just be out of my life and be safe – – – but, no, he still has to beep the horn at me and flash his lights at me and still to this day tormenting me and not – – – all I want is just [to be] done.  No, I don't think I owe him anything.

(App. at 123–24).

Carpenter testified she did not pursue any claims against Rozell for what she understood he owed her because:

> I felt that, yes, if I wanted to be involved with him any further I could have gotten money from him. That's what I believed, but I didn't want it, I wanted to be done. I was willing to forego whatever I was entitled to in that house to be done with him.

(App. at 129–30).

Carpenter also testified that, although Rozell showed her an appraisal stating the Ring was valued at roughly $17,000, she came to believe that amount was neither the price Rozell paid for the Ring nor the actual value of the Ring at the time she sold it. (App. at 120–21, 131–37, 142–45, 149–52).

Carpenter testified multiple circumstances led her to believe that Rozell replaced the Ring's diamond with one less valuable. She testified that, like many nurses, she often did not wear her ring at work and would instead leave it in her jewelry box at home. She also testified that on several occasions she returned from work to find the Ring missing because Rozell had taken the Ring and hidden it from her. On one such occasion, Carpenter testified Rozell informed her, upon returning the Ring, "you're not going to get anywhere near what you think you would get if you sold this." (App. at 150). She testified she was not sure what Rozell meant by this comment or why he would say it. She also testified:

> I have no idea why he said that. I have no idea why he went in the jewelry box and removed it from my jewelry box in the first place. I don't know why he did those things or said those things. I believe he did and said things very often just to upset me, but I don't know for a fact why he did it.

(Id. at 150–51). Carpenter testified she later learned Rozell did not pay the $17,000 appraisal value as he had previously told her.

4

Carpenter further testified to another instance when Rozell took the Ring and denied responsibility.  On this occasion, Rozell instructed her to call the police because it must have been stolen, and only after she placed the call and spoke with police did Rozell inform her that he had the Ring all along.  However, this time when he produced the Ring, it was broken into two pieces.  She testified as follows:

> So after that he said he was going to bring it to Jewelry Designs to have it fixed because he broke it and three days later he brought me back another ring and I remember at that point like I hadn't really suspected, even when he said, oh, you're not going to get what you think you'll get that time, like I kind of – – – for a long time I convinced myself that the couples counselor and my co-workers and my family and my friends and the police and the domestic violence people were wrong, but after a while I came to believe they were correct.

> So the other times I kind of said to myself, ah no, I must be crazy, it doesn't look the same.  This time I really – – – I started to believe that everybody was right over time after living with him for a while and then I started – – – I actually looked at it and I remember saying on the phone to people that are close to me, that are my support systems, I must be nuts, this isn't the same, this isn't the same.

(App. at 133–134).

Carpenter testified that, shortly after this incident and shortly before she moved out, she took the Ring to two different jewelers to have the Ring appraised.  She testified she visited the first jewelry store before she made arrangements to move, and the first jeweler informed her that he could not give her an exact appraisal without removing the diamond from its setting.  She did not want the jeweler to remove the diamond from the setting because "I was afraid to have them do anything, for [Rozell] to know that I was doing anything, because I didn't have a place to go yet." (App. at 137).  The jeweler identified a defect in the diamond, which Carpenter described as a black line across the top of the diamond visible with a magnifying glass.  This jeweler estimated the Ring to be worth between $2,000 and $4,000.

Shortly thereafter, Carpenter made firm arrangements for a new place to live and movers to transport her and her son's belongings.  At that point, she needed to sell the Ring to fund the move, and she went to a different jewelry store to get a second opinion as to the Ring's value. The jeweler at this store and his outside diamond appraiser each said the Ring was worth $2,000. She testified:

> [A]t that point I had arrangements where I could, you know, have a place to go, so I went ahead and I just said all right, it is what it is, I'm doing it, I've got to get out of here and I wasn't about to go around shopping around to a third or a fourth jeweler to tell me the same thing.  I believed that when I got the same information from two different jewelers that it must be true and they showed me the same [defect in the diamond] with the looking glass, whatever you call it, so that's why I believe it was not the same ring.

(App. at 136–37).

When Rozell's lawyer questioned why she did not sell the Ring to the first jeweler, she responded, "I wanted to get out – – – because I didn't want to waste another second.  I need that. I had it set up where I could get out of the house." (App. at 138).  She testified she did not try to sell the Ring back to the jeweler from whom Rozell purchased it because it was "not even in the same state."  (Id.).  She further testified she did not know the original jeweler's location, "I never was there.  The [other two stores], I knew where they were, that was why I went there."  (Id. at 139).  She did, however, contact the jewelry store from which Rozell purchased the Ring to ask about the repair Rozell claimed to have done, but the store would not provide any information without Rozell's consent.  Carpenter testified she did not seek Rozell's consent because she was afraid.  When Rozell's lawyer questioned her about why she did not return the Ring if she were afraid, she said it was "[b]ecause I couldn't get out of the house if I didn't have the money, I needed the money to get out."  (Id. at 140).

Later in the deposition, Rozell's lawyer returned to questioning her as to why she sold the Ring to the second jeweler. She testified the appraiser at the first store was only in the shop one or two days a week, and by then she did not want to wait until the appraiser was in the store because, "when I went to the second jeweler I had already secured a way to get out of the house and I was going to get out and that was all I was going to do. I was not going to waste time." (App. at 152). She continued, "I was not waiting [until the appraiser was at the first jewelry store.] I was getting out of that house. . . . I was getting out of that house, so I was not waiting and going back to another jeweler." (Id.). She testified the amount she received in exchange for the Ring "was close enough to me, the number, to what the [first jeweler] said, so I said, well, it must be right." (Id.). She believed the valuation because the first jeweler, the second jeweler, and the outside diamond appraiser provided similar estimates.

Carpenter further testified she sold the Ring only after she called her new landlord and was able to move up her move-in date, "because I was frightened." (App. at 153).

Rozell's lawyer questioned Carpenter about when she told Rozell she sold the Ring. She testified, "I think that was done through the attorneys. I know I never told him." (App. at 157). She also testified she was not sure when or how Rozell was informed she had sold the Ring.

Rozell's lawyer then returned to whether Carpenter discussed the sale with Rozell, and Carpenter responded she did not think such a discussion was reasonable, given Rozell's threats and the police's multiple instructions to seek an order of protection. Rozell's lawyer continued to question her about her failure to consult with Rozell, and she responded, "I didn't want to have any contact with him, I wanted to be away, but I also didn't believe that if [I consulted with him] that I would get a truthful answer, so I didn't see any point." (App. at 164).

7

Carpenter testified in response to being asked if she was fearful of Rozell, "Yes. Over time I became more and more fearful as his behavior became more and more frightening." (App. at 164). Carpenter also testified, in addition to being afraid of Rozell, she moved out because Rozell made it impossible for her to do her job, and that she would have gotten fired if she remained in the house. She explained that she could not do her job "without a secured internet [connection at home,] and he knew that and that's why he disconnected that." (Id. at 164–165).

III.     Other Record Evidence

Carpenter submitted an affidavit to the Bankruptcy Court in which she averred: (i) "Rozell was extremely mentally abusive to me and my son"; (ii) "[w]hen I finally left Mr. Rozell, his abuse had become so overwhelming as to make it unsafe for me or my son to live with him"; (iii) "[my son and I] suddenly and stealthily left so [Rozell] would not thwart my attempts to leave"; (iv) "I made several attempts to sell the engagement ring he had given me, however it had a broken base and consequently I was only [able] to receive $2,000.00 for the ring"; and (v) "[t]he ring was trash." (App. at 61).

The only record evidence submitted by Rozell is Rozell's verified complaint against Carpenter in the New York Supreme Court, Putnam County, and Rozell's declaration attached to his motion for summary judgment. The only relevant evidence from these documents is the assertion that Rozell and Carpenter terminated the engagement due to irreconcilable differences.

IV.     Procedural History

Carpenter filed a Chapter 7 bankruptcy petition on July 26, 2013. Carpenter listed Rozell as a creditor in Schedule F of the petition.

On October 15, 2013, Rozell commenced an adversary proceeding against Carpenter seeking a determination that the debt Carpenter owed Rozell arising out of her sale of the Ring that Rozell had given her in contemplation of marriage, N.Y. CIV. RIGHTS LAW § 80-b,[2] was not dischargeable.  (App. at 1–3).  On September 24, 2015, Rozell moved for summary judgment. (Id. at 20–28).  The Bankruptcy Court held a hearing on Rozell's motion on November 10, 2015, and denied the motion on November 19, 2015.  (Id. at 63–79).

Thereafter, Carpenter moved for summary judgment.  (App. at 80–82).   The Bankruptcy Court held a hearing on the motion on May 10, 2016 (Id. at 227–35), and granted the motion on May 26, 2016.  (Id. at 225–26).  The Bankruptcy Court granted summary judgment to Carpenter on Rozell's claims for the debt's nondischargeability under Section 523(a)(4) and Section 523(a)(6) of the Bankruptcy Code.  The Bankruptcy Court granted summary judgment on the Section 523(a)(4) claim because there was no evidence of a fiduciary relationship or fraudulent intent and on the Section 523(a)(6) claim because there was no evidence Carpenter acted with malice.

Rozell appeals both rulings.

## DISCUSSION

I.      Standard of Review

A district court reviews a bankruptcy court's conclusions of law de novo and its findings of fact for clear error.  See In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009)

---

[2]      Section 80-b "is a 'no-fault' statute, permitting the recovery of property given in contemplation of a marriage that does not take place, regardless of who is responsible for the failure of the marriage to go forward."  Lipschutz v. Kiderman, 76 A.D.3d 178, 183 (2d Dep't 2010).

(citing In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994)).  When a district court

reviews a bankruptcy court's grant of summary judgment, it reviews the decision "de novo

because the determination that there are no genuine issues of material fact is a legal conclusion."

In re Teligent Inc., 324 B.R. 479, 487 (S.D.N.Y. 2005).

Rule 56 of the Federal Rules of Civil Procedure applies in adversary proceedings.  Fed.

R. Bankr. P. 7056.  Rule 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense—or
> the part of each claim or defense—on which summary judgment is sought.  The
> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter of
> law.

The Court must grant a motion for summary judgment if the pleadings, discovery materials

before the Court, and any affidavits show there is no genuine issue as to any material fact and it

is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law. . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which "a

reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess

whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60

(2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any

genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of her case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider admissible evidence.  Nora Bevs., Inc. v. Perrier Grp. Of Am. Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.     Appellant's Challenges

The Bankruptcy Court granted Carpenter's motion for summary judgment as to Rozell's claims under both Section 523(a)(4) and Section 523(a)(6), and Rozell challenges both rulings.

The Court addresses each challenge in turn.

A.     Section 523(a)(4)

Section 523(a)(4) provides, "A discharge under [certain listed sections] of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Rozell's argument with respect to his Section 523(a)(4) claim on appeal is especially abstruse.  Nowhere in his submissions to this Court—either in his briefing or in the appendix (which includes his briefing to the Bankruptcy Court)—does Rozell articulate which of the four bases under Section 523(a)(4) renders Carpenter's debt nondischargeable; namely, fraud in a fiduciary capacity, defalcation in a fiduciary capacity, embezzlement, or larceny.  Relatedly, Rozell argues the Bankruptcy Court committed various errors, but fails to explain how any of the claimed errors prejudiced him.  Moreover, Rozell's only citations to legal sources are in referencing the Bankruptcy Court's decision; he provides no legal support in favor of his argument, other than to argue the Bankruptcy Court was wrong.

Given Rozell's failure to aid the Court's understanding of this case, the relevant legal framework, or his own arguments, the Court examines each of the four bases for nondischargeability under Section 523(a)(4) as applicable to this appeal and addresses Rozell's arguments when the Court finds them to be relevant.  The Court then addresses Rozell's argument regarding the nature of damages suffered.

1.      Fraud or Defalcation While Acting in a Fiduciary Capacity

"When determining the dischargeability of a debt under Code § 523(a)(4), 'there is no need to consider whether debtor has committed "fraud or defalcation" unless it is first determined that debtor was "acting in a fiduciary capacity".'"  In re Siddell, 191 B.R. 544, 551 (Bankr. N.D.N.Y. 1996) (quoting In re Turner, 134 B.R. 646, 648 (Bankr. N.D. Okla. 1991)) (alteration omitted).

The meaning of "fiduciary capacity" under Section 523(a)(4) is determined by federal law and is very limited.  Zohlman v. Zoldan, 226 B.R. 767, 772 (S.D.N.Y. 1998).  "Section 523(a)(4) applies only to express or technical trusts.  Constructive or implied trusts, or any trust where the existence of the trust is created merely on the basis of wrongful conduct . . . do not create a fiduciary relationship."  Id.  "To satisfy the fiduciary capacity requirement, the plaintiff must prove that: (1) a technical or express trust was established; (2) the trust relationship pre-existed the debt's creation; and (3) the debt was generated within the scope of the fiduciary relationship."  In re Guthier, 2010 WL 1443989, at *5 (Bankr. N.D.N.Y. Apr. 9, 2010).  Determining whether an express or technical trust exists is a matter of state law.  Zohlman v. Zoldan, 226 B.R. at 773.

Neither the Bankruptcy Court nor either of the parties provides the legal requirements of an express or technical trust or analyzes the record evidence with respect to either type of trust.

Nevertheless, Rozell contends Carpenter and Rozell had a bailment regarding the Ring and that, "as a bailee, [Carpenter] had a fiduciary duty to hold [his] property in trust and return it to him once the engagement was terminated."  (Appellant's Br. at 7).  Rozell makes this argument without explaining the basis for his conclusion that a donee of an engagement ring is a

13

bailee and a donor is a bailor.  Similarly, Rozell does not explain why such a bailment creates a fiduciary relationship for the purposes of Section 523(a)(4).  Rozell asserts that a trust existed without clarifying whether the purported trust was an express or technical trust, and provides no analysis to support that conclusion.

Despite Rozell's failure to explain his argument, the little he does explain is fatal to his fiduciary duty claim.  This is because, even if Carpenter were acting as a bailee (a proposition the Court doubts but need not decide), a bailment is not a trust, much less an express or technical trust as Section 523(a)(4) requires.  Under New York law, the requirements of a trust are "(1) a designated beneficiary, (2) a designated trustee, who is not the same person as the beneficiary, (3) a clearly identifiable res, and (4) the delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee." Starr Int'l Co. v. Am. Int'l Grp., Inc., 648 F. Supp. 2d 546, 559 (S.D.N.Y. 2009) (quoting Agudas Chasidei Chabad of U.S. v. Gourary, 833 F.2d 431, 434 (2d Cir.1987)).  A bailment cannot be a trust, because "a bailment involves a change in possession but not in title." Bailment, BLACK'S LAW DICTIONARY (10th ed. 2014).

Notwithstanding Rozell's failed argument that Carpenter was acting as a fiduciary for the purposes of Section 523(a)(4) because she was a bailee, there is nevertheless insufficient record evidence to support a reasonable jury's conclusion that an express or technical trust existed.  "An express trust 'is initiated by one entity's transfer of property to another entity coupled with a manifestation of an intention to create a trust.'" In re Parker, 388 B.R. 11, 18 (Bankr. N.D.N.Y. 2008) (quoting In re Suarez, 367 B.R. 332, 351 (Bankr. E.D.N.Y. 2007)).  Here, there is no evidence Rozell intended to create a trust, and therefore no reasonable jury could so find.

14

Technical trusts are those trusts in which the trustee's "obligations are imposed pursuant to statute or common law."  In re Schulman, 196 B.R. 688, 697 (Bankr. S.D.N.Y. 1996).   Rozell has not provided the Court, and the Court is not aware of, any statutory or common law authority creating a trust on this record, and therefore there is no issue of material fact on the issue.

Accordingly, there is no issue of material fact that Carpenter was not acting in a fiduciary capacity for the purposes of Section 523(a)(4), such that the Bankruptcy Court did not err in granting summary judgment to Carpenter with respect to Rozell's claim of nondischargeability due to fraud or defalcation in a fiduciary capacity.

                    2.    Embezzlement

Rozell fails to state the law regarding the nondischargeability of debts under Section 523(a)(4) due to embezzlement.  Nevertheless, he makes multiple assertions which could be construed as an argument that the Bankruptcy Court erred in granting summary judgment regarding embezzlement.

The Court first explains the relevant legal framework for Section 523(a)(4), before turning to each assertion and why each is unavailing.

For the purposes of Section 523(a)(4), "the term 'embezzlement' is to be determined under federal common law."  In re Bevilacqua, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985). According to federal common law, "[t]o prove embezzlement the claimant must show that the debtor appropriated the funds for h[er] own purposes and that [s]he did so with fraudulent intent or deceit."  Id. at 334.

First, Rozell asserts Carpenter's "stated intent was to sell the ring and convert the proceeds to her own use—for the purpose of moving—ignoring the fact that she was being

offered a fraction of the ring's worth," and therefore there is a material issue of fact regarding Carpenter's fraudulent intent.  (Appellant's Br. at 8).  Rozell does not explain how selling the Ring below his perceived value for the purpose of moving evinces fraudulent intent.  Indeed, the record evidence shows Carpenter did not believe Rozell had any legal claim to the Ring, she believed she did receive market value for the Ring, and she was not concerned with receiving market value because she was focused solely on moving herself and her son out of their shared home with Rozell, a situation she and others believed to be dangerous.

Second, Rozell asserts "[a] blatant selling of an engagement ring[,] . . . in a spiteful manner, surely could be construed as having a fraudulent intent."  (Appellant's Br. at 8).  Rozell provides neither record citations for these assertions nor an explanation of how Carpenter committed a "blatant selling of an engagement ring."  If Rozell means to argue Carpenter sold the Ring in a "completely obvious, conspicuous, or obtrusive . . . manner" or in a "crass or offensive manner," Blatant, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984), with respect to Rozell, and therefore she harbored fraudulent intent, his argument is not supported by the record or reason.

The record does not support this contention because there is no evidence suggesting Rozell was aware Carpenter was selling the Ring or that Carpenter intended to publicize the sale to Rozell.  Indeed, the only record evidence on the matter is directly contrary.  Carpenter testified she did not personally inform Rozell she was selling or had sold the Ring.  Moreover, she testified she does not know exactly how Rozell learned she sold the Ring, but that it was after the fact and likely via communications between their lawyers.  Reason does not support his

argument because, if she were to have informed Rozell, it would not have been an act of deception or fraud.

Third, Rozell argues Carpenter sold the Ring "with full knowledge of the consequences and that [Carpenter] was selling property that did not belong to her." (Appellant's Br. at 8). The record evidence directly contradicts this assertion. At best, the record shows she was either uncertain as to the true legal ownership of the Ring or she did not consider who held legal title to the Ring in her frantic effort to flee from a dangerous situation.

Finally, Rozell asserts Carpenter committed "[a] blatant selling of [the Ring] . . . in a spiteful manner," which evinces "fraudulent intent [and] embezzlement." (Appellant's Br. at 8). Rozell does not explain how Carpenter sold the Ring in a manner demonstrating "petty ill will or hatred with the disposition to irritate, annoy, or thwart," Spite, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984), or how, if she did, it would evince fraudulent intent or embezzlement.

Rozell's arguments fail as they are nonsensical and contrary to the record.

Accordingly, there is no issue of material fact that Carpenter did not commit embezzlement for the purposes of Section 523(a)(4), such that the Bankruptcy Court did not err in granting summary judgment to Carpenter with respect to Rozell's claim of nondischargeability due to embezzlement.

3.    Larceny

Rozell's briefing before this Court does not hint at error with respect to the Bankruptcy Court's grant of summary judgment regarding larceny. Thus, any arguments asserting error are

17

waived.  JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428

(2d Cir. 2005).

           4.     Nature of Damages

Rozell argues the Bankruptcy Court committed an error of law in stating "the damages

sustained by plaintiff are in the nature of contract damages."  (Appellant's Br. at 9 (quoting App.

at 233)).

Even if Rozell were correct the Bankruptcy Court committed an error of law, he fails to

explain how any such error is "inconsistent with substantial justice" or affect his "substantial

rights" and therefore warrants reversal.  In re Residential Capital, LLC, 563 B.R. 477, 485

(S.D.N.Y. 2016) appeal filed, In re ("Harmless error, meaning an error not inconsistent with

substantial justice or that does not affect the parties' substantial rights, is not grounds for

reversal.").

As the Court has already explained, Carpenter was properly granted summary judgment

on Rozell's Section 523(a)(4) claim.  Thus, even if the Bankruptcy Court misstated the law on

this point, correcting the error would not result in a different outcome.  Thus, any such error is

not reversible error.

Accordingly, the Court affirms the Bankruptcy Court's grant of summary judgment as to

Rozell's Section 523(a)(4) claim.

           B.     Section 523(a)(6)

Section 523(a)(6) provides, "A discharge under [certain listed sections] of this title does

not discharge an individual debtor from any debt . . . for willful and malicious injury by the

debtor to another entity or the property of another entity."

Rozell argues the Bankruptcy Court erred in granting summary judgment for lack of evidence that Carpenter acted with malice.  Rozell contends Carpenter's statement "that she needed the money and that the ring was trash," along with her "cavalier sale of the property," imply Carpenter committed malicious and "intentional conversion," such that there is a material issue of fact.  (Appellant's Br. at 10).

The Court disagrees.

Carpenter's statement that she needed money and that the Ring was trash does not evince Carpenter acted with malicious intent to injure Rozell, nor does it evince she sold the Ring cavalierly.  Carpenter's explained she sold the Ring expeditiously because she was trying to remove herself from a dangerous living situation, and selling the Ring was a source of funding.  Moreover, she believed the Ring to be damaged based on the opinions of three persons in the field.  This evidence does not show malice; it explains why she sold the Ring for $2,000, rather than the amount Rozell believed the Ring was worth.

Notwithstanding Rozell's failed argument, the Court's thorough and independent review of the record reflects that Carpenter is entitled to summary judgment because there is no material issue of fact that she did not willfully injure Rozell, much less with malice.

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional <u>injury</u>, not merely a deliberate or intentional <u>act</u> that leads to injury."  <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998).  "[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances.  There may be a conversion which is innocent or technical, an unauthorized

19

assumption of dominion without willfulness or malice." <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 332 (1934).

There is insufficient evidence here for a reasonable jury to find Carpenter willfully injured Rozell in selling the Ring, much less that she did so with malice. The record reflects only that she did not think Rozell had any claim to the Ring and that she did not think about how Rozell might be impacted by her sale of the Ring. Although it is obvious Carpenter deliberately and intentionally sold the Ring, there is insufficient evidence for a reasonable jury to find she sold the Ring with anything more than negligent disregard for the fact that Rozell might be injured as a result.

Instead of reflecting an intent to injure Rozell, the record reflects only that plaintiff sold the Ring to obtain funds to finance the costs of moving herself and her son to a new home. The record evidence shows that, at the time Carpenter sold the Ring, she operated under an "honest but mistaken belief," <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. at 332, that Rozell had no claim to the Ring. That is to say she did not understand Rozell had any legal interest in the Ring, such that she did not understand her sale of the Ring, even at price below market value, would injure Rozell in any way. Therefore, there is insufficient evidence for a reasonable jury to find Carpenter acted with willful and malicious intent to injure Rozell. <u>See</u>, <u>e.g.</u>, <u>Id</u>. at 330–32 (concluding debtor's debt dischargeable under predecessor to Section 523(a)(6) when debtor honestly but mistakenly believed it had lawful authority to sell automobile subject to a promissory note of the creditor, and thus debtor did not willfully and maliciously injure creditor through conversion).

Accordingly, the Court affirms the Bankruptcy Court's grant of summary judgment as to Rozell's Section 523(a)(6) claim.

## CONCLUSION

The order of the Bankruptcy Court granting summary judgment in Carpenter's favor is AFFIRMED in all respects.

The Clerk is instructed to terminate the pending appeal and close this case.

Dated:  March 29, 2017
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

21